**SIDLEY AUSTIN LLP**
Lee S. Attanasio
Alex R. Rovira
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

*Attorneys for the Petitioner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | |
|---|---|
| In re | : |
| | : Chapter 15 |
| Petition of David McGuigan, as foreign | : |
| representative of | : Case No. 11-[_____] (___) |
| | : |
| Tokio Marine Europe Insurance Limited | : |
| | : |
| Debtor in a Foreign Proceeding. | : |
| | : |
| | : |

------------------------------------------------------------ x

## VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF A FOREIGN PROCEEDING AND MOTION FOR PERMANENT INJUNCTION

David McGuigan (the "Petitioner"), as the duly appointed and authorized foreign

representative, as defined in section 101(24) of title 11 of the United States Code (the

"Bankruptcy Code"), of Tokio Marine Europe Insurance Limited (the "Scheme Company" or

"Debtor"), which is subject to an adjustment of debt proceeding (the "English Proceeding") and

bound by that certain scheme of arrangement pursuant to Part 26 of the Companies Act 2006

(the "Scheme")[1] sanctioned by the High Court of Justice of England and Wales (the "English

Court") on April 15, 2011, by its U.S. counsel, Sidley Austin LLP, respectfully submits this

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Scheme. A true and correct copy of the Scheme and Explanatory Statement is attached hereto as <u>Exhibit A</u>. The Explanatory Statement is similar to a chapter 11 disclosure statement and includes information which Scheme Creditors may reasonably be expected to require in order to make an informed decision on whether or not to support the Scheme.

Verified Petition Under Chapter 15 For Recognition Of A Foreign Proceeding And Motion For Permanent Injunction (the "Verified Petition and Motion") pursuant to sections 105(a), 1502, 1504, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and Rule 65 of the Federal Rules of Civil Procedure as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in furtherance of the Official Form Petition (the "Chapter 15 Petition") filed contemporaneously herewith pursuant to sections 1504 and 1515 commencing this chapter 15 case (the "Chapter 15 Case"), seeking recognition of, and requesting permanent injunctive and other relief in aid of, the foreign proceeding described herein, and in support thereof respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Petitioner, as foreign representative of the Scheme Company, has commenced this Chapter 15 Case pursuant to section 1504 of the Bankruptcy Code by filing the Chapter 15 Petition contemporaneously herewith, accompanied by all certifications, statements, lists and documents required pursuant to section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Bankruptcy Rules, seeking recognition of a foreign main proceeding, as defined in sections 101(23) and 1502(4) of the Bankruptcy Code, and requesting permanent injunctive and other relief necessary to aid such foreign main proceeding and the implementation of the Scheme.[2]  Relief under chapter 15 of the Bankruptcy Code is necessary to

---

[2]     The Petitioner seeks recognition and relief respecting a foreign main proceeding, as defined in section 1502(4) of the Bankruptcy Code, with respect to the Scheme sanctioned by the English Court in England.  The foreign proceeding was before the English Court in England and the center of the Scheme Company's main interest is in England.  Nevertheless, should this Court determine that the proceeding is not a foreign main proceeding, the Petitioner respectfully requests that the Court entertain the Chapter 15 Petition of the Scheme Company as one for recognition of, and relief respecting, a foreign nonmain proceeding, as defined in section 1502(5) of the Bankruptcy Code.  The Scheme Company has a place of operations in England where it carries out nontransitory economic activity.  Therefore, the Scheme Company has an establishment, as defined in section 1502(2) of the Bankruptcy Code, in England. This assertion is not intended as, nor should it be construed or

ensure that Scheme Creditors domiciled in the United States will not be able to take action to their advantage and to the disadvantage of other creditors, thereby potentially jeopardizing the Scheme.

      2.      The Declaration of David McGuigan (the "<u>McGuigan Declaration</u>"), filed contemporaneously herewith and incorporated by reference as if fully set forth herein, accurately recites the facts pertinent to, and necessary to sustain, the Chapter 15 Petition and the relief requested thereby, including, without limitation, evidence that:

        (a)      a foreign proceeding respecting the Scheme Company was duly commenced in England;

        (b)      the center of main interests of the Scheme Company is in England;

        (c)      the Scheme Company carries out nontransitory economic activity in England;

        (d)      the Petitioner has been duly appointed and authorized to serve as the foreign representative of the Scheme Company and to petition for relief under chapter 15; and

        (e)      the Scheme Company is entitled to the relief requested.

      3.      The Scheme Company is an insurance company. It is incorporated under the laws of England and Wales and maintains its registered office in England.

      4.      The business with which the Scheme is concerned (the "<u>Scheme Business</u>") is exclusively reinsurance business. The Scheme Company underwrote non-life insurance and reinsurance business in the London insurance market under the name The Tokio Marine & Fire Insurance Company (U.K.) Limited, between 1970 and 2002, and, from 2002 onwards, under its present name. This business was mainly non-marine and included traditionally long-tail policies exposed to asbestos, pollution and health hazard type risks

_____

interpreted as, an admission for any purpose or proceeding, other than for satisfying the requirement of having an "establishment," as defined in section 1502(2) of the Bankruptcy Code.

emanating principally from Europe and the United States. The Scheme relates to only part of the Scheme Company's business. The Scheme Business includes certain of the reinsurance business written by the Scheme Company under underwriting stamps T0304, T0403 and T0502 (subject to an exclusion for certain T0502 stamp contracts) from 1970 onwards. Details of the Scheme Business and the business excluded from the Scheme are contained at Appendix A to the Scheme at pages 71 to 74 and in the Explanatory Statement at page 9.

5.      In addition, the Scheme Business also includes all the reinsurance business transferred to the Scheme Company in 1994 by Tokio Reinsurance Company Limited (also known as Tokio Rückversicherungs-Gesellschaft AG and Tokio Compagnie De Reassurance SA) ("Tokio Re"). Tokio Re was incorporated in Switzerland and operated a branch office in the United Kingdom. The business transferred to the Scheme Company from Tokio Re consisted of:

(a)      all the policies entered into by Tokio Re through its registered branch in the United Kingdom. These policies related to facultative and treaty reinsurance of general business; and

(b)      all the policies entered into by Tokio Re through its head office in Switzerland. These policies related to treaty reinsurance of general business.

6.      For the avoidance of doubt, the Scheme Business does not include the following:

(a)      in the case of underwriting stamp T0502, liabilities arising from Engineering and CAR insurances or reinsurances with policy reference numbers commencing "3500";

(b)      liabilities arising from the business assumed by TMEI as a participating company in the Willis Faber Underwriting Management ("WFUM") Pools, which was subject to a separate scheme of arrangement;

(c)     liabilities other than in respect of Scheme Reinsurance Contracts; and

(d)     liabilities in respect of "compulsory insurance" under the laws of the United Kingdom, for example, employers' liability policies and the compulsory element of motor policies under the laws of the United Kingdom.

7.      The Scheme Business has been in solvent "run-off" since 2004.  The run-off involves the management of liabilities arising from the Scheme Business.  In the normal course, it is estimated that it would take at least another 30 to 40 years to run-off the remaining liabilities which are included in the Scheme.

8.      Accordingly, to bring the run-off of the Scheme Business to a close, the Scheme Company proposed a "cut off" scheme of arrangement.  The Scheme will enable Scheme Creditors to be paid early by providing for all claims (including contingent and unliquidated claims) to be valued and paid as soon as possible.  The key objectives of the Scheme are the crystallization and payment of Scheme Claims in an orderly fashion.

9.      The Scheme Company is solvent and anticipates that all claims addressed by the Scheme will be paid in full in accordance with the Scheme.

10.     A scheme of arrangement such as that which has become effective in respect of the Scheme Company is a statutory compromise or arrangement between a company and its creditors (or any class of them) pursuant to Part 26 of the Companies Act 2006.  For a scheme to be approved or sanctioned by an English Court, the English Court must first permit a meeting or meetings of creditors to be called and, at such meeting(s), votes in favor of the scheme must be cast by creditors constituting, of those present and voting whether in person or by proxy, a majority in number representing at least three-fourths in value.  Upon approval of the scheme by the requisite majorities of scheme creditors, the English Court then considers

NY1 7616408v.6

whether the scheme should be sanctioned. Once a scheme has been sanctioned by the English Court and a copy of the order sanctioning it is delivered to the Registrar of Companies for England and Wales (the "Registrar of Companies"), as a matter of English law, the scheme becomes legally binding on all creditors that are affected by the scheme, wherever located and regardless of their votes on it.

11.     The Scheme establishes a method by which present and future claims of Scheme Creditors will be estimated and full and final payments will be made to Scheme Creditors considerably sooner than if the run-off of the Scheme Company continued in the ordinary course.

12.     On April 7, 2011, the requisite majorities of the Scheme Creditors of the Scheme Company voted in favor of the Scheme. Indeed, the Scheme was unanimously approved. On April 15, 2011, the English Court, upon notice and a hearing, entered an order sanctioning the Scheme (the "Sanction Order"). A true and correct copy of the Sanction Order is attached hereto as Exhibit B.

13.     The Effective Date of the Scheme is April 15, 2011, the date on which a copy of the Sanction Order for the Scheme was delivered to the Registrar of Companies. See Registrar of Companies Stamped Receipt of Sanction Order for the Scheme attached hereto as Exhibit C.

14.     By this Verified Petition and Motion, the Petitioner seeks recognition of the Scheme and a permanent injunction and other relief necessary to ensure the effective implementation of the Scheme through the entry of an Order of this Court, substantially in the form of the proposed Order Granting Recognition of a Foreign Main Proceeding, a Permanent

Injunction and Related Relief in Aid of the Scheme in the United States (the "Proposed Order"), a copy of which is attached hereto as Exhibit D.

15.    This Verified Petition and Motion satisfies all the requirements set forth in section 1515 of the Bankruptcy Code.  Given that the relief requested herein is necessary to give effect to the Scheme in the United States, the relief requested is appropriate under chapter 15 of the Bankruptcy Code.  Granting recognition to the Scheme and the relief requested herein is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code and is in the best interests of the Scheme Company and the Scheme Creditors.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

17.    Venue is properly located in this District pursuant to 28 U.S.C. § 1410.

## FACTUAL BACKGROUND

### *General Background*

18.    The Scheme Company was incorporated in England on September 15, 1970 under the name of The Tokio Marine & Fire Insurance Company (U.K.) Limited.  It was changed to its present name on June 17, 2002.  The Scheme Company's registered office is at 150 Leadenhall Street, London,  EC3V 4TE, England.

19.    The Scheme Company conducts its business operations from its offices in the United Kingdom and employs approximately 170 employees in the United Kingdom.  The

Scheme Company's balance sheet as of December 31, 2010 shows total unconsolidated assets of approximately $724 million (using the exchange rate $1:0.62(GBP) published in the Financial Times as of June 28, 2011), substantially all of which are held in or connected to England. The Scheme Company estimates that approximately 65% of its total assets are located in the United Kingdom and approximately $136 million of its total liabilities are owed to policyholders in the United Kingdom.

20.     The Scheme Business (which is only part of the Scheme Company's business) is all London market reinsurance business written through the use of brokers in the United Kingdom. The Scheme Company estimates that it has approximately 97,000 policyholders worldwide in respect of all business written by it. In the United Kingdom, there are 237 policyholders with business subject to the Scheme.

*U.S. Property Located Within This District*

21.     The Scheme Company is licensed to write surplus lines of insurance in New York and renews that license annually. In connection with such license, the Scheme Company is required to maintain funds in a bank account in the United States. Accordingly, the Scheme Company maintains approximately $6 million in an account at the New York branch of Union Bank. In addition, the Scheme Company has assets consisting of, among other things, reinsurance recoverables due from entities located in the United States, including in this District.

22.     The Scheme Company has Scheme Creditors located throughout the United States including in New York. Specifically, the Scheme Company has approximately 53 policyholders in the United States holding approximately 481 policies subject to the Scheme. Of the 53 U.S. policyholders, 9 are New York-based (the largest single grouping of U.S. policyholders, who also represent the majority of the Scheme Company's U.S. exposure). The

NY1 7616408v.6

Scheme Company estimates that its potential exposure to policyholders in respect of Scheme Business in the United States is approximately $244 million.

*The Scheme of Arrangement*

23.    The Scheme was designed to reorganize the Scheme Company's business by subjecting its London market reinsurance business to the scheme process so as to enable the Scheme Company to close down its reinsurance department in circumstances where the Tokio Group continues to write new reinsurance business. The Scheme Company continues to write insurance business in the London insurance market.  The Scheme Company believes that it is in its interests and the interests of Scheme Creditors to try to finalize the run-off of the Scheme Business through the Scheme in a much shorter time frame than would happen in the ordinary course of a run-off.

24.    The Scheme has been designed to enable the Scheme Company and the Scheme Creditors to terminate their Scheme Business involvements with each other simultaneously, to provide a mechanism for agreeing or determining Scheme Claims of the Scheme Creditors (including outstanding claims and IBNR (as defined in the Scheme) claims) and to pay or discharge these claims, as agreed or determined under the Scheme, in full in the shortest practicable time.  Scheme Creditors will receive full payment of the value of their Net Ascertained Claim (as defined below), which will be reflected as a final balance shown in favor of the Scheme Creditor on the Valuation Statement, without any discounting for the time-value of money.[3]

25.    The Scheme establishes an orderly process by which the present and future Scheme Claims of Scheme Creditors against the Scheme Company in respect of the

---

[3]    <u>See</u> McGuigan Declaration, ¶¶ 47-52.

Scheme Business will be estimated and satisfied at such estimated value. The Scheme will replace a Scheme Creditor's right to payment in respect of claims which have arisen or may arise under a Scheme Reinsurance Contract against the Scheme Company in the normal course of business with the right to receive payment under the Scheme equal to the Scheme Creditor's claim, net of adjustments (the "Net Ascertained Claim").

26.     Scheme Creditors were advised in the Explanatory Statement that the Scheme Company intended to seek a permanent injunction from this Court, pursuant to chapter 15 of the Bankruptcy Code, inter alia, ordering that the Scheme be given full force and effect, and be binding on and enforceable against all Scheme Creditors in the United States. Schedule VI to the Explanatory Statement contained an explanation of relief under chapter 15 of the Bankruptcy Code and a summary of the relief which the Scheme Company is seeking in that regard.

27.     Part 1 of the Scheme contains certain preliminary provisions, including definitions used in the Scheme and a guide to interpretation of the Scheme language.

28.     Part 2 of the Scheme contains provisions regarding, among other things, (i) the application and purpose of the Scheme, (ii) information regarding Claim Forms and the Bar Date, (iii) adjudication of Disputed Claims, (iv) determination of the value of Net Ascertained Claims, and (v) the effect of the Scheme on the rights of Scheme Creditors.

29.     Part 3 of the Scheme contains provisions regarding the determination and payment of Net Ascertained Claims.

30.     Part 4 of the Scheme contains provisions regarding, among other things, (i) the stay of Proceedings and acts prohibited by Scheme Creditors, (ii) claims for interest, and (iii) payment by means of Security.

31.     Part 5 of the Scheme contains provisions regarding the role of the Scheme Manager and its powers, duties and obligations.  Pro Insurance Solutions Limited ("Pro")[4] is the Scheme Manager.  The Scheme Manager has the power to manage and control the business and affairs of the Scheme Company for the purpose of implementing the Scheme together with the powers specifically conferred on it by the Scheme.

32.     Part 6 of the Scheme contains provisions regarding the Scheme Adjudicator, conflicts of interest which may affect the role, and instructions with respect to vacating and appointing the office of Scheme Adjudicator.  The Scheme Adjudicator will act as an independent expert and not as an arbitrator.[5]  The Scheme Adjudicator will adjudicate all aspects of a disputed matter, including any matters of fact and law (consulting with other experts if necessary) and determine the value of Disputed Claims.  The Scheme Adjudicator is required to be a suitably qualified, independent individual.

33.     Part 7 of the Scheme contains provisions regarding the role of the Scheme Adviser and his powers, duties and functions.  The Petitioner is the Scheme Adviser.  Scheme Creditors may give notice to the Scheme Adviser if they consider that the Scheme is not being operated in accordance with its terms.  The Scheme Adviser is required to review and investigate any such complaint and, if he considers that it is justified, advise the Scheme Company and the Scheme Manager on the steps that should be taken to remedy it.

34.     Part 8 of the Scheme contains provisions regarding the completion of the Scheme and other general provisions, including, among other things, co-operation between

---

[4]     Pro, a company incorporated in England, is a provider of (re)insurance outsourcing and consultancy services.  Among other activities, Pro specializes in managing and administering the run-off of (re)insurance businesses.

[5]     Under the Scheme, the proposed first Scheme Adjudicator was George Maher of Towers Watson.  By virtue of the Convening Order, Mr. Maher was appointed as Vote Assessor for the Creditors' Meeting.  As a result of his leaving Towers Watson, Mr. Maher resigned from the role of Vote Assessor and Scheme Adjudicator on March 1, 2011.  On March 29, 2011, John Birkenhead of HJC Actuarial Consulting Limited was appointed as Vote Assessor and nominated as Scheme Adjudicator.

Scheme Creditors, the Scheme Manager and the Scheme Company, prohibited payments, notice and the governing law of the Scheme, which is that of England and Wales.

<u>*Scheme Approval and Sanctioning Process*</u>

35.     In preparation for the approval of the Scheme and the sanctioning process, the Scheme Company caused an extensive investigation to be made to identify all the policyholders who may be Scheme Creditors (the "<u>Notice Parties</u>") based on the particular features of their policies, including claims history, the nature of the risks covered by their policies and the likelihood that claims might arise under them. A copy of the Policyholder Identification Report, which details the work done as of November 26, 2010 to identify policyholder addresses, and its results, is attached hereto as <u>Exhibit E</u>.

36.     By a letter dated August 28, 2009 (the "<u>Practice Statement Letter</u>" or "<u>PSL</u>"), notice of the formulation of the Scheme and the Scheme Company's intent to seek permission of the English Court to convene a creditors' meeting relating to the Scheme (the "<u>Creditors' Meeting</u>") was sent to all 1,505 identified Notice Parties for whom an address had been obtained. A copy of the Practice Statement Letter was also sent to 144 brokers, agents and other intermediaries, requesting that they notify any of their clients that they believed might be affected by the Scheme. As of October 15, 2010, a total of 349 Practice Statement Letters had been returned undelivered to Pro. In respect of 335 of these, Pro has subsequently been able to find an alternative address for the relevant policyholder, and the PSL has been re-sent to such alternative addresses. In respect of 14 of the PSLs returned undelivered, Pro has subsequently discovered that the entities have either been dissolved or did not enter into policies with the Scheme Company in respect of Scheme Business and, therefore, are not Scheme policyholders. A true and correct copy of the Practice Statement Letter is attached hereto as <u>Exhibit F</u>.

NY1 7616408v.6

37.     The information contained in the Practice Statement Letter was published in (i) England in (a) the Financial Times (UK and worldwide) on September 1, 2009, (b) Insurance Day on September 1, 2009, and (c) the London Gazette on September 1, 2009; and (ii) the USA in (a) Business Insurance magazine on August 31, 2009, (b) The Wall Street Journal (USA edition) on September 1, 2009, and (c) The Wall Street Journal (International edition) on September 1, 2009.

*Commencement of the English Proceeding*

38.     On November 29, 2010, the Scheme Company filed an application with the English Court seeking permission to convene the Creditors' Meeting for the purpose of allowing Scheme Creditors to vote on the Scheme.

39.     On December 2, 2010, the English Court conducted a hearing and entered an order (the "Convening Order"), determining that it had jurisdiction over the Scheme Company and directing that the Creditors' Meeting be convened for the purpose of considering and, if thought appropriate, approving the Scheme (with or without modification). A true and correct copy of the Convening Order is attached hereto as Exhibit G.

40.     Among other things, the Convening Order required that, at least 56 calendar days before the Creditors' Meeting, all Notice Parties be sent a Court-approved cover letter (the "Covering Letter") containing copies of (a) the notice convening the Creditors' Meeting (the "Notice"); (b) the Explanatory Statement; and (c) the Form of Proxy and Voting Form (the "Voting Form").[6] See Convening Order, at ¶¶ 2-3. The Convening Order further required that the Covering Letter and enclosed documents be sent by pre-paid first class mail or airmail addressed to (i) each person or entity of which Pro was aware and which it believed was or might be a Scheme Creditor, and for which it had a current address; and (ii) each existing

---

[6]  Copies of the foregoing documents have also been made available on the Website at www.tmeischeme.com.

broker or successor to a broker known by Pro to have claims within the scope of the Scheme and for which it had a current address, in each case to what Pro reasonably believed to be its last known address.  See id.  The Convening Order also required the Scheme Company, at least 56 calendar days before the Creditors' Meeting, to cause to be published an advertisement giving notice of the Creditors' Meeting.  Such notice was advertised on the Scheme website (the "Website") and stated that the (a) Voting Form, (b) Explanatory Statement; and (c) the Scheme rules and appendices thereto (the "Scheme Document") could be downloaded from the Website or obtained in hard copy, free of charge, by contacting Pro on the contact details contained therein (the "Advertisement").  The Convening Order required that the Advertisement be published once in each of the newspapers and publications listed in the Schedule to the Convening Order or in such further publications as may be deemed appropriate by the Scheme Company.

41.     In accordance with paragraph 6 of the Convening Order, the Advertisements were published in (i) England in (a) the Financial Times (UK edition) on December 20, 2010, (b) Insurance Day on December 20, 2010, and (c) the London Gazette on December 20, 2010;  (ii) the USA in (a) Business Insurance magazine on December 20, 2010, (b) The Wall Street Journal (USA National as part of Global) on December 21, 2010, and (c) The Wall Street Journal (International as part of Global) on December 21, 2010.

42.     Pursuant to the Convening Order, Frank Attwood was appointed to act as chairman of the Creditors' Meeting.  See Convening Order, at ¶ 10.

43.     The Convening Order gave the Scheme Company liberty to convene a single Creditors' Meeting on March 8, 2011 (or as soon as reasonably practicable thereafter and in any event on or before July 29, 2011) at Sidley Austin LLP, Woolgate Exchange, 25

NY1 7616408v.6

Basinghall Street, London EC2V 5HA, United Kingdom.  See Convening Order, at ¶ 1.  Due to the need to appoint a replacement Vote Assessor and Scheme Adjudicator following Mr. Maher's resignation on March 1, 2011, the Creditors' Meeting was opened and adjourned on March 8, 2011 without any voting taking place.

44.     The re-convened Creditors' Meeting was held on April 7, 2011 and the requisite majorities of the Scheme Creditors voted in favor of the Scheme.  On April 15, 2011, the English Court, upon notice and a hearing, entered the Sanction Order sanctioning the Scheme.

45.     The Effective Date of the Scheme is April 15, 2011, the date on which a copy of the Sanction Order was delivered to the Registrar of Companies.  See Registrar of Companies Stamped Receipt of Sanction Order for the Scheme attached hereto as Exhibit C.

### *Implementation of the Schemes*

46.     By letter dated April 28, 2011, the Scheme Manager caused to be sent by post, to each Scheme Creditor known to it as of the Effective Date, and for whom it had a current address: (i) notification of the Effective Date, (ii) a Claim Form, and (iii) notice of the Bar Date.  Such notice also has been placed on the Website and advertised in (i) England in (a) the Financial Times (UK and worldwide) on May 3, 2011, (b) Insurance Day on May 3, 2011 (c) the London Gazette on May 3, 2011; and (ii) the USA in (a) Business Insurance magazine on May 2, 2011, (b) The Wall Street Journal (USA National as part of Global) on May 3, 2011 and (c) The Wall Street Journal (International as part of Global) on May 3, 2011.

47.     Claim Forms sent to Scheme Creditors included details of all known Scheme Reinsurance Contracts, which in the reasonable opinion of the Scheme Manager might give rise to that Scheme Creditor having a Scheme Claim, together with details of any claim

arising under or balance in relation to such Scheme Reinsurance Contract which, as at the Effective Date, was valid and due having been agreed by or on behalf of the Scheme Company and the party to which it was due, but which had not been paid by it or discharged by the operation of set-off or otherwise ("Unpaid Agreed Claims").

48.     Scheme Creditors are required to submit their claims by the Bar Date, which is 11:59 pm London Time on October 12, 2011.  Where a Claim Form shows an Unpaid Agreed Claim this will be deemed to have been submitted by the Bar Date even if the Scheme Creditor does not return its Claim Form by the Bar Date.  Such Scheme Creditors therefore will receive settlement of Unpaid Agreed Claims even if they do nothing.

49.     Within 180 days of the Bar Date, the Scheme Manager will attempt in good faith to negotiate a mutually agreed value for each Scheme Creditor's Scheme Claim.  If a value is agreed upon, it shall become that Scheme Creditor's Agreed Claim.

50.     If no agreement has been reached by the end of this 180-day period, the Scheme Manager will send the Scheme Creditor an Inwards Valuation Form setting out either (i) the amount which the Scheme Manager believes is due in respect of each of that Scheme Creditor's unagreed Scheme Claims or (ii) the total amount which the Scheme Manager believes is due to that Scheme Creditor (including any Agreed Claims).  The Scheme Creditor has 56 days from such notification to dispute any amount set out in its Inwards Valuation Form by way of a Dispute Notice, failing which it shall be deemed to have accepted the notified value.  Where a Scheme Creditor sends a Dispute Notice to the Scheme Manager, within 28 days of receipt of the notice, the Scheme Manager must refer the Disputed Claim(s) to Adjudication.  The adjudication procedure is designed to deal with claims as expeditiously, economically and fairly as possible.  Unless the Scheme Adjudicator acts dishonestly or beyond the scope of his

authority, his decision will, with respect to the Scheme Creditor's Agreed Claim, so far as English law permits and in the absence of Manifest Error, be final and binding on the Scheme Company, the Scheme Manager and the Scheme Creditor concerned. Discounting will not be applied to Scheme Claims.

51.     The result of these processes will be that a Valuation Statement will be produced for each Scheme Creditor setting out the balance in favor of the Scheme Creditor or the Scheme Company. The Valuation Statement will be sent to each Scheme Creditor as soon as reasonably practicable. The Valuation Statement will set out the total value of each Scheme Creditor's Agreed Claims and, for those who are reinsurers of the Scheme Company or otherwise are susceptible to set-off under the Scheme, their offset balances. Certain other adjustments, as described in clause 2.14 of the Scheme, will also be applied and the resulting amount will be the Scheme Creditor's Net Ascertained Claim or, if it shows a balance in favor of the Scheme Company, the Scheme Creditor's Net Debt. A Valuation Statement becomes binding upon the Scheme Creditor unless disputed within 42 days of its date. Any values shown on a Valuation Statement (to the extent that the Scheme Creditor has not seen them before) may be disputed on substantive grounds. The value of Agreed Claims, which the Scheme Creditor has had the chance to dispute prior to the Valuation Statement, may at this stage only be disputed on the grounds of Manifest Error. If agreement cannot be reached between the Scheme Manager and the Scheme Creditor within 70 days of the date of the Valuation Statement, the substantive disputes will be resolved by the Scheme Adjudicator. If the Valuation Statement shows a Net Debt, the Scheme does not purport to bind the Scheme Creditor to pay that amount to the Scheme Company.

52.     The Scheme Manager will procure the payment of Net Ascertained Claims to be made to each Scheme Creditor as soon as reasonably practicable after the date on which such Scheme Creditor's Valuation Statement containing a Net Ascertained Claim has become final and binding, and in any event within 42 days thereof. The Scheme Manager has the discretion to make payment to Scheme Creditors prior to this, if their Net Ascertained Claim has become binding at an earlier stage.

## **RELIEF REQUESTED**

53.     The Petitioner seeks the entry of an order of this Court, pursuant to sections 105(a), 1502, 1504, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Bankruptcy Rules, substantially in the form of the Proposed Order, granting the following relief necessary to best advance the goals of the Scheme and to assure its effective implementation, and recognizing that the relief referred to below will affect Scheme Creditors solely with respect to the Scheme and/or Scheme Claims:

(a)     recognition of the Petitioner as a "foreign representative" pursuant to 11 U.S.C. § 101(24);

(b)     recognition of the English Proceeding as a "foreign proceeding" pursuant to 11 U.S.C. § 1517(a);

(c)     recognition of the English Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1);[7]

(d)     all relief afforded a foreign main proceeding automatically upon recognition pursuant to 11 U.S.C. §1520;[8]

---

[7]     Should the Court determine that the foreign proceeding in respect of the Scheme Company is not a "foreign main proceeding," the Petitioner respectfully requests that the Court treat the Scheme Company's Chapter 15 Petition as one requesting recognition and relief as a "foreign nonmain proceeding," as defined in section 1502(5) of the Bankruptcy Code. The Scheme was sanctioned by the English Court in the United Kingdom where the Debtor clearly carries on a nontransitory economic activity. It therefore has an "establishment" within the meaning of section 1502(2), entitling the Scheme to recognition as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Bankruptcy Code.

(e)     granting comity to and giving full force and effect to the Scheme and Sanction Order;

(f)     awarding the Petitioner such other and further relief as this Court may deem just and proper;

(g)     additional relief, as authorized by section 1521 of the Bankruptcy Code, including, among other things:

  (i)     that the Scheme (including any amendments or modifications to the Scheme on or before the date of the Order) and the Sanction Order shall be given full force and effect and shall be binding on and enforceable against all Scheme Creditors, including without limitation, against a Scheme Creditor in its capacity as a debtor of the Scheme Company, in the United States and its territories;

  (ii)    that all Scheme Creditors and any parties acting on behalf of or deriving title from any Scheme Creditor are hereby permanently enjoined and restrained from:

    (a)     taking or continuing any step, or doing or continuing any act by way of Proceedings (as defined in the Scheme) or otherwise, in any jurisdiction whatsoever: (i) against or in respect of the Scheme Company or the Property (as defined in the Scheme) of the Scheme Company, for the purpose of obtaining payment, or establishing the existence or quantum, of any Scheme Claims; or (ii) save as permitted by clause (b) below, against or in respect of any of the Released Parties (as defined in the Scheme) either individually or collectively in connection with their duties and obligations under the Scheme; and

    (b)     commencing or continuing any legal or equitable action or proceedings challenging the validity of any act done or omitted to be done by the Released Parties in connection with the Scheme, including in the United States and its territories, and/or (where appropriate) the meeting of Scheme Creditors held on March 8, 2011 and April 7, 2011, and the Released Parties shall not be liable for any loss suffered by any Scheme Creditor or third party,

---

[8]     Should the Court determine that the foreign proceeding in respect of the Scheme Company is a foreign nonmain proceeding, the Petitioner respectfully requests that this Court grant, pursuant to section 1521 of the Bankruptcy Code, the same relief against individual creditors that the Scheme Company would automatically enjoy under section 1520, including: (i) staying the commencement or continuation of any action or proceeding concerning the assets, rights, obligations or liabilities of the Scheme Company; (ii) staying execution against assets of the Scheme Company; (iii) suspending the right to transfer or otherwise dispose of any assets of the Scheme Company; and (iv) requiring all persons and entities in possession, custody or control of property in the United States, or the proceeds of such property of the Scheme Company to turnover and account for such property or proceeds to the Petitioner for administration in the United Kingdom in accordance with the Scheme and finding that the interests of the Scheme Creditors in the United States are sufficiently protected by such administration and that, under the law of the United States, such property and proceeds should be administered in the English Proceeding.

unless such loss is attributable to their fraud or dishonesty; accordingly, no Scheme Creditor shall bring or institute any Proceedings, claims or complaints against the Released Parties to the extent prohibited by the Scheme;

(c)     enforcing any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order or arbitration award and commencing or continuing any act or any other legal or equitable action or proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever) to create, perfect or enforce any lien or other security interest, set-off, attachment, garnishment, or other claim against the Scheme Company in connection with the Scheme, or any of its property in the United States, and its territories, or any proceeds thereof, including, without limitation, rights under reinsurance or retrocession contracts;

(d)     invoking, enforcing or relying on the benefit of any statute, rule or requirement of federal, state or local law or regulation requiring the Scheme Company to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), and such statute, rule or requirement will be rendered null and void for Proceedings, except in compliance with the Scheme; provided, however, that nothing in the Order shall in any respect affect any Security in existence at the Effective Date or the replacements for such Security;

(e)     withdrawing from, setting off against, or otherwise applying property which is the subject of any trust or escrow agreement or similar agreement in which the Scheme Company has an interest in excess of amounts expressly authorized by the terms of the trust, escrow, or similar agreement; and

(f)     drawing down any letter of credit established by, on behalf or at the request of, the Scheme Company, in excess of amounts expressly authorized by the terms of the contract or other agreement pursuant to which such letter of credit has been established;

(iii)   that a Net Ascertained Claim or Net Debt determined under the Scheme shall be final and binding on the Scheme Company and any person or entity that is a Scheme Creditor;

(iv)     that all Scheme Creditors of the Scheme Company are permanently enjoined from taking any action in contravention of or inconsistent with the Scheme;

(v)      that except as otherwise provided in the Order or in the Scheme, in the absence of a bona fide dispute raised and conducted in accordance with the Scheme, all persons and entities in possession, custody, or control of property of the Scheme Company in the United States and its territories, or the proceeds thereof, are required to turn over and account for such property or proceeds thereof to the Scheme Company;

(vi)     that nothing in the Order prevents the continuance or commencement of proceedings against any person, entity, or other insurer other than the Released Parties; provided, however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Released Parties, such settlement or judgment shall not be binding on or enforceable against the Released Parties or their property, or any proceeds thereof;

(vii)    that the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure, pursuant to Bankruptcy Rule 7065, shall be, and the same hereby are, waived with respect to the injunctive relief provided in the Order;

(viii)   that no action taken by the Released Parties in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Scheme, the Order, this Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any adversary proceedings in connection therewith will be deemed to constitute a waiver of the immunity afforded pursuant to section 306 or section 1510 of the Bankruptcy Code, the law of the United States or otherwise;

(ix)     that all Scheme Creditors that are beneficiaries of letters of credit established by, on behalf or at the request of the Scheme Company or parties to any trust, escrow or similar arrangement in which the Scheme Company has an interest are required to:

(a)      provide notice to the Petitioner's United States counsel of any drawdown on any letter of credit established by, on behalf or at the request of, the Scheme Company, or any withdrawal from, set-off against, or other application of property that is the subject of any trust or escrow agreement or similar arrangement in which the Scheme Company has an interest, together with information sufficient to permit the Scheme Manager to assess the propriety of such drawdown, withdrawal, set-off or other application, including, without limitation, the date and amount of such drawdown, withdrawal, set-off or other application and a copy of

any contract, related trust or other agreement pursuant to which any such drawdown, withdrawal, set-off, or other application was made, and provide such notice and other information contemporaneously herewith; provided, however, no drawing against any letter of credit or withdrawal from any escrow, trust or similar arrangement shall be made in connection with any commutation unless the amount of such drawing has been agreed in writing with the Scheme Company and the Scheme Manager; and

(b)     turn over and account to the Scheme Manager for any funds resulting from the drawdown of any letter of credit or the application of funds subject to any trust, escrow or similar arrangement, withdrawal, set-off, or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such letter of credit, trust, escrow or similar arrangement has been established;

(x)     that the Scheme Company and the Scheme Manager be authorized to transfer to the foreign proceeding for distribution pursuant to the Scheme any monies or assets of the Scheme Company which the Scheme Company or the Scheme Manager have or may hereafter recover in connection with the Scheme;

(xi)     that all persons that have a claim of any nature or source against the Scheme Company in connection with the Scheme and who are parties to any proceedings (including, without limitation, arbitration or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever) in which the Scheme Company is or was named as a party, or as a result of which a liability of the Scheme Company may be established in connection with the Scheme, is required to place the Petitioner's United States counsel (Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Lee S. Attanasio, Esq., and Alex R. Rovira, Esq.) on the master service list of any such action or other legal proceeding, and to take such other steps as may be necessary to ensure that such counsel receives:

(a)     copies of any and all documents served by the parties to such action or other legal proceeding or issued by the court, arbitrator, administrator, regulator or similar official having jurisdiction over such action or legal proceeding; and

(b)     any and all correspondence, or other documents circulated to parties named in the master service list;

(xii)     that the English Court has exclusive jurisdiction to hear and determine any suit, action, claim or proceeding and to settle any dispute which may

NY1 7616408v.6

arise out of the construction or interpretation of the Scheme, or out of any action taken or omitted to be taken by any of the Released Parties in connection with the Scheme; provided, however, that in relation to the determination of Scheme Claims, nothing in the Order affects the validity of provisions determining governing law and jurisdiction, whether contained in any contract between the Scheme Company and any of its Scheme Creditors or otherwise;

(xiii)    that this Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of the Order or requests for any additional relief in this Chapter 15 Case and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court;

(xiv)    that the Order shall be served:

(a)    by United States mail, first class prepaid, on or before such date as prescribed by this Court upon all the known Scheme Creditors in the U.S. of whose current address the Scheme Manager is aware at the date of service;

(b)    by publication on the Website; and

(c)    by publication of notice of the entry of the Order in The Wall Street Journal (US Edition) and Business Insurance magazine on or before such date as prescribed by this Court; and

(xv)    that such service will be good and sufficient service and adequate notice of the Order for all purposes.

54.    Granting the above relief and recognizing the Scheme will ensure that the Scheme Company's affairs in respect of the Scheme Business are expeditiously resolved, consistent with the goal of chapter 15 to provide assistance to foreign courts and foreign representatives.

## BASIS FOR RELIEF

55.    Chapter 15 of the Bankruptcy Code was specifically designed to assist foreign representatives such as the Petitioner in the performance of their duties. One of its express objectives is the "fair and efficient administration of cross-border insolvencies that

protects the interests of all creditors, and other interested entities, including the debtor." 11 U.S.C. § 1501(a)(3).

56.     Under the auspices of the English Court, and with the ancillary assistance of this Court, the ultimate goal of the Petitioner and the Scheme Company is to satisfy the claims of the Scheme Creditors in a fair and efficient manner sooner than would be achieved if the Scheme Business remained in run-off without the Scheme.

57.     The Petitioner submits that the relief sought herein is well within the scope of chapter 15 and that the criteria for recognition and the issuance of an injunction under chapter 15 are clearly satisfied under the facts of this case.  Relief under chapter 15 of the Bankruptcy Code is necessary to ensure that United States Scheme Creditors will not be able to take action to their  advantage and to the disadvantage of other creditors, thereby potentially jeopardizing the Scheme.

58.     If the Scheme Creditors in the United States are permitted to seek their own remedies, assets of the Scheme Company could be depleted unnecessarily to defend actions brought in the United States in contravention of the intent of the Scheme and the Sanction Order granted by the English Court.  Absent the relief requested, including injunctive relief, the Scheme Company, its assets and creditors will be irreparably harmed.  If the Scheme Creditors in the United States are permitted to seek their own remedies, assets of the Scheme Company could be depleted.  In addition, those Scheme Creditors could gain an advantage over others, and there would be no orderly and uniform administration of claims against the Scheme Company in one central forum.

59.     In contrast to the hardships that would occur without the relief requested herein (as described above), preservation of the Scheme Company's assets for distribution in

accordance with the terms of the Scheme will not prejudice the Scheme Creditors in the United States.

60.     To preserve the Scheme Company's assets for equitable distribution among the Scheme Creditors pursuant to the Scheme, the Scheme bars any proceedings against the Scheme Company or its property (wherever located) seeking to establish the existence or amount of any liability or to obtain payment of any liability, unless the Scheme Company has failed to perform an obligation to make a payment to a Scheme Creditor in respect of a Net Ascertained Claim. Recognition of the Scheme under chapter 15 of the Bankruptcy Code and the grant of the relief requested herein are necessary to promote the goals of the Scheme and to ensure its effective implementation. In order to best preserve assets that may be made available to satisfy claims of Scheme Creditors, it is imperative that all claims and distributions be administered in accordance with the terms of the Scheme. If proceedings brought by Scheme Creditors are not stayed in the United States, the orderly determination and settlement of Scheme Claims may be jeopardized and the Scheme Company may be forced to expend resources unnecessarily in order to defend collection and other actions brought by Scheme Creditors in the United States.

61.     In addition to the reasons set forth above, a Memorandum of Law in Support of the Verified Petition Under Chapter 15 For Recognition Of Foreign Proceeding And Motion For Permanent Injunction, filed contemporaneously herewith, sets forth more fully the Petitioner's legal support for, and position respecting entitlement to, recognition and the above-requested relief.

<u>**HEARING ON PETITION FOR RECOGNITION AND RELIEF**</u>

62.     By Application for Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice filed contemporaneously with the Chapter 15 Petition, the

Petitioner has requested that the Court set the date for the hearing on recognition and relief (the "Recognition Hearing") at the earliest possible time, pursuant to section 1517(c) of the Bankruptcy Code, preferably September 8, 2011 or September 9, 2011, or as soon thereafter as this Court is available.

63.     Granting the above relief and recognizing the Scheme will ensure that the Scheme Company's affairs are expeditiously resolved, consistent with the goal of chapter 15 to provide assistance to foreign courts.

## NOTICE

64.     As soon as the Recognition Hearing is scheduled, the Petitioner will cause to be sent by first-class mail to all U.S.-based Notice Parties, a Notice of Filing and Hearing which shall append: (i) the Chapter 15 Petition; (ii) the Verified Petition and Motion (without exhibits); (iii) the Memorandum of Law in Support of the Verified Petition and Motion; (iv) the List submitted pursuant to Bankruptcy Rule 1007(a)(4); (v) the Statement of Foreign Representative required pursuant to 11 U.S.C. §1515; and (vi) the Proposed Order.  The Notice shall be sent in order to provide notice by mail to the parties at least 21 days prior to the hearing date, as required by Bankruptcy Rule 2002(q).

65.     By such notice, all U.S. parties-in-interest will be advised of the commencement of the Chapter 15 Case, the relief requested by the Chapter 15 Petition, the central documents filed with the Court respecting this Chapter 15 Case, as well as the date, place and time of the Recognition Hearing and the date, time and manner for lodging a response or motion respecting the Chapter 15 Petition, in accordance with the Bankruptcy Rules and the Local Rules of Bankruptcy Procedure.  The Petitioner also shall cause such notice in

substantially the form of the Notice to be published expeditiously on the Website, <u>Business Insurance</u> magazine and <u>The Wall Street Journal</u> (US Edition).

NY1 7616408v.6

## CONCLUSION

WHEREFORE, the Petitioner respectfully requests that this Court enter an order substantially in the form of the Proposed Order, attached hereto as Exhibit D, granting the relief requested herein and such other and further relief as is just and proper.

Dated:  July 18, 2011                                SIDLEY AUSTIN LLP
      New York, New York


                                By: /s/ Lee S. Attanasio
                                   Lee S. Attanasio
                                   Alex R. Rovira
                                   787 Seventh Avenue
                                   New York, New York 10019
                                   Telephone:  (212) 839-5300
                                   Facsimile:   (212) 839-5599

                                   *Attorneys for the Petitioner*

NY1 7616408v.6

```
--------------------------------------------------------x
In re                                            :
                                                 : Chapter 15
Petition of David McGuigan, as foreign           :
representative of                                : Case No. 11-[_____] (___)
                                                 :
Tokio Marine Europe Insurance Limited            :
                                                 :
Debtor in a Foreign Proceeding.                  :
                                                 :
--------------------------------------------------------- x
```

David McGuigan, pursuant to section 1746 of title 28 of the United States Code hereby declares

under penalty of perjury of the laws of the United States as follows:

1.  I am the duly authorized foreign representative of the Tokio Marine Europe Insurance Limited and as such am duly authorized to commence this Chapter 15 Case, request the relief sought thereby and make this Verified Petition and Motion in this case.

2.  I have read the foregoing Verified Petition and Motion and I am informed and believe that the factual allegations contained therein are true and correct.

3.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of July 2011
in _____, London

David McGuigan
Foreign Representative of
Tokio Marine Europe Insurance Limited